NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13247

JAMES CARVER  vs.  COMMISSIONER OF CORRECTION & another.[1]


Essex.      September 9, 2022. - April 3, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt,
& Georges, JJ.


Parole.  Imprisonment, Parole.  Commissioner of Correction.
    Practice, Civil, Action in nature of certiorari.



    Civil actions commenced in the Superior Court Department on
January 29 and March 11, 2021.

    After consolidation, the cases were heard by Jeffrey T.
Karp, J., on motions for judgment on the pleadings.

    The Supreme Judicial Court granted an application for
direct appellate review.


    Sharon L. Sullivan-Puccini for the plaintiff.
    Scott McLean for the defendants.
    Mara Voukydis, Committee for Public Counsel Services, Tatum
A. Pritchard, Jacob Addelson, David Milton, Lauren Petit, & Ada
Lin, for Prisoners' Legal Services of Massachusetts & others,
amici curiae, submitted a brief.


---

    [1] Superintendent, Old Colony Correctional Center.

CYPHER, J.  James Carver, the plaintiff, currently is serving fifteen life sentences for murder in the second degree. Commonwealth v. Carver, 33 Mass. App. Ct. 378, 379, 389 (1992). In 2020, the plaintiff submitted a petition requesting medical parole pursuant to G. L. c. 127, § 119A (§ 119A or statute). The Commissioner of Correction (commissioner) denied the petition, after receiving a recommendation in support of denial from the superintendent of the Old Colony Correctional Center (superintendent).  The commissioner subsequently denied two additional requests for release.

In this opinion, we consider whether the commissioner's decision to deny the plaintiff medical parole was arbitrary or capricious.  In McCauley v. Superintendent, Mass. Correctional Inst., Norfolk, 491 Mass.    ,    (2023), we determined that 501 Code Mass. Regs. § 17.02 (2019) does not impermissibly narrow the scope of the statute.  With that in mind, and after consideration of the facts of the present case, we conclude that the commissioner's determination that the plaintiff would pose a public safety risk on release is supported by the record.[2]

Background.  1.  Petition for medical parole.  On September 30, 2020, the plaintiff filed a petition for medical parole,

---

[2] We acknowledge the amicus brief submitted by Prisoners' Legal Services of Massachusetts, the Disability Law Center, and the Committee for Public Counsel Services.

pursuant to § 119A.  The plaintiff indicated that the reasons for the request were that he has many comorbidities, he is confined to a wheelchair, and he has family willing to care for him.  His petition included a medical parole plan.

On October 21, 2020, the superintendent recommended against medical parole for the plaintiff.  He recognized the plaintiff's proposed plan for medical parole, and the completed medical assessment of the plaintiff.  The superintendent submitted a risk assessment and a classification report, as required by the statute, but did not include a medical parole plan aside from discussing the plaintiff's plan.  The superintendent opined that the plaintiff did not meet the criteria for medical parole, citing his ability to transfer independently to and from his wheelchair, his relatively young age, his mobility, a physician's opinion that the plaintiff was not permanently incapacitated or terminally ill, improvement in his prostate cancer diagnosis, the seriousness of his offenses, his minimal recent programming, and a 2019 disciplinary report as indicators that he "would pose a major risk to public safety if released."

The plaintiff's risk assessment, conducted in 2009, indicated that he had been arrested or charged three or more times with a new crime while on pretrial release.  It noted that he has received serious or administrative disciplinary infractions for fighting or threatening other inmates or staff.

The plaintiff's drug screen resulted in a score of zero, indicating a low risk of substance use disorder.  The assessment categorized his needs as low for criminal involvement and noncompliance history, and high for violence history and current violence.  Despite finding the plaintiff's needs high for violence-related concerns, the assessment characterized his violence and recidivism risks as low.

The plaintiff received a score of two on his classification report, suggesting that he should be placed in minimum custody or below.  He received a score of six for the severity of his current offense; scores of zero for severity of convictions within the last four years, history of escape or attempts to escape, prior institutional violence within the last three years, and number of disciplinary reports within the last year; and scores of negative two for his age, which was fifty-six at the time, and his program participation or work assignment, indicating that he satisfied all of his program requirements. Due to his conviction of a crime resulting in loss of life, Department of Correction (department) policy did not permit minimum security, and because of the need for alternate placement "following conflicts" at the Massachusetts Correctional Institution at Shirley (MCI-Shirley), medium custody level was recommended in July 2020.

On November 3, 2020, the district attorney's office wrote a letter to the commissioner opposing the plaintiff's petition. The district attorney's office pointed to the medical assessment stating that he was at "high risk" to become "permanent[ly] incapacitat[ed]," but that he currently was not permanently incapacitated such that he does not pose a public safety risk.

On December 4, 2020, the commissioner denied the plaintiff's petition for medical parole. The commissioner recognized his numerous medical conditions but stated that the medical assessment did not opine that the plaintiff currently was "terminally ill" or "permanently incapacitated" within the meaning of the statute, and she concluded that his medical condition was not "so debilitating that [he did] not pose a public safety risk."

Shortly after the commissioner released her decision, the plaintiff's attorney requested preservation of video footage (video) from an incident (use of force incident) relied on in the commissioner's decision, which was not part of the administrative record. The attorney sent a letter requesting reconsideration of the petition for medical parole, along with another letter requesting that the commissioner watch the video of the incident.[3] On January 29, 2021, before receiving a

---

[3] The plaintiff's attorney dated the letters January 15, 2020. It appears, however, that the accurate date would have

response from the commissioner, the plaintiff filed a complaint in the nature of certiorari in the Superior Court challenging the commissioner's denial.

Awaiting a response from the commissioner, the plaintiff's attorney sent her another letter on February 2, 2021, reiterating the attorney's request that the video be preserved. On February 9, the plaintiff sent the commissioner additional medical and mental health records.  In response, counsel for the commissioner told the plaintiff's attorney "that the administrative record on reconsideration is limited to those materials that [the commissioner] deems relevant to her decision making."  The district attorney's office sent an updated opposition, and an updated medical parole assessment was provided to the commissioner.

On March 1, 2021, the commissioner denied the plaintiff's request for reconsideration.  She indicated that she considered the updated medical information, the incident reports relating to the use of force incident, supplemental letters, and a renewed opposition from the district attorney's office, but made no mention of the video.  She noted that there was no "significant and material change" to the plaintiff's medical

_____

been January 15, 2021, as she refers in the letters to an incident occurring in June 2020 and the commissioner's December 2020 decision.

condition and that she did not believe that he would live and remain at liberty without violating the law.[4]  She opined that his release would be incompatible with the welfare of society. The commissioner claimed that, although the updated medical assessment stated that the plaintiff has "multiple risk factors for mortality and morbidity" and "debilitating medical conditions with permanent mobility and other functional incapacitation," it did not assert that he was either "terminally ill" or "permanently incapacitated" within the meaning of the statute.

The plaintiff then filed another complaint in the nature of certiorari in the Superior Court seeking review of this subsequent denial, and the cases were consolidated.  Both parties filed a motion for judgment on the pleadings, and the plaintiff filed a motion to strike the administrative record submitted by the department and replace it with a record to include the video of the use of force incident.  After a hearing, a Superior Court judge ordered the commissioner to

---

[4] In Harmon v. Commissioner of Correction, 487 Mass. 470, 477 (2021), we held that the mandatory language of G. L. c. 127, § 119A (c) (1), prohibited the department from requiring "a significant and material decline in medical condition" for a petitioner to submit a new petition.  Consequently, we do not consider this reason in the commissioner's decision when analyzing whether she abused her discretion.

review the video and issue a "revised decision" on the plaintiff's medical parole petition.

On August 17, 2021, the commissioner issued a new decision denying the plaintiff's petition for medical parole. She explicitly reviewed the video, as well an updated medical assessment, and a written statement from the district attorney's office. After describing the district attorney's position on the video in detail, the commissioner indicated that she agreed with it and opined that the plaintiff did not meet the criteria for medical parole. She found that he did not meet the criteria for "permanent incapacitation, as he [did] not have a physical or cognitive incapacitation that [was] so debilitating that he [did] not pose a public safety risk." The commissioner stated that his medical conditions were all stable, and that he required a wheelchair for mobility, "but only due to an unsteady gait and tremors, as opposed to physical weakness." She noted that independently he was able to "perform a number of activities of daily living," cited the severity of his offense, and observed that "[i]n his current physical condition, [he was] certainly still capable of committing a similar crime." She further stated that nothing in the video demonstrated that the plaintiff was either terminally ill or permanently incapacitated.

On December 17, 2021, after submission of new filings incorporating the commissioner's latest decision, a Superior Court judge held a hearing on the motions for judgment on the pleadings.  At the hearing, the judge asked the plaintiff whether the statute required the commissioner to consider the medical parole plan in determining whether a petitioner was permanently incapacitated.  Initially, the plaintiff's counsel responded, "I don't think so. . . .  [S]he has to find those three things, and then he should be released in the process, and then they could look at the plan."  Subsequently, counsel said that the commissioner would consider the medical parole plan in determining whether the plaintiff was a safety risk.  In a written decision, the judge denied the plaintiff's motion for judgment on the pleadings, and a judgment was entered affirming the commissioner's decision.  The plaintiff filed a timely notice of appeal, and we granted his application for direct appellate review.

2.  Criminal case.  A jury convicted the plaintiff of fifteen counts of murder in the second degree and one count of burning a dwelling house stemming from an early morning fire set on July 4, 1984, at a rooming house in Beverly.  Carver, 33 Mass. App. Ct. at 379.  On December 1, 1989, he was sentenced to

several consecutive life sentences in prison with the possibility of parole.[5]

An investigator determined that the fire started in an alcove adjacent to the front entrance to the building and was set with a stack of newspapers found next to the door and hydrocarbon accelerant. Carver, 33 Mass. App. Ct. at 379-380. During the night before the fire, the plaintiff confronted a man who lived in the rooming house and was dating the plaintiff's former girlfriend. Id. at 380. The plaintiff warned the man that if he continued to date her, the plaintiff would kill him and burn down his house. Id. On the morning of the fire at around 1:15 A.M., the plaintiff told a friend that he was upset because of his breakup and that he wanted his girlfriend back. Id. Between 3 A.M. and 4 A.M., a taxicab driver observed the plaintiff standing in front of the rooming house, and a newspaper delivery woman saw a man standing in the entryway to the rooming house leaning over a stack of newspapers.[6] Id. The fire started at 4:18 A.M. Id. Although the plaintiff's parents testified that he was home and asleep at that time, the

_____

[5] Including the above charges, the plaintiff has had twenty-four adult arraignments. These resulted in seventeen convictions, including sixteen convictions of offenses against the "person" and one of a "property" offense.

[6] Another man in the area at the time saw a man smoking a cigarette in the doorway of the rooming house and stated that it was not the defendant. Carver, 33 Mass. App. Ct. at 380.

plaintiff made numerous incriminating statements, and admitted to two friends that he had started the fire. Id. Fifteen people died. Most of the victims died from smoke inhalation combined with severe burns, but one victim died jumping from an upper window trying to escape the burning building.

Based on the "official version" of the offenses retained by the department, a week after the fire the plaintiff began to make "harassing" telephone calls to his former girlfriend and appeared at her work in an emotional state. As he was leaving, he yelled out the window, "[T]his is the next place I will burn." Later, he emotionally confessed to his friend that he had lit the fire, but that he had not meant to kill people. The plaintiff disagrees with this version of events.

The plaintiff has filed numerous motions for a new trial, and he has appealed from the denial of his motions. He became parole eligible in 2018, but he chose to postpone his parole hearing.

3. Plaintiff's medical condition. On October 9, 2020, Dr. John Straus and Despina Kiely, a nurse practitioner, of the department's medical provider, performed a medical parole assessment of the plaintiff. He has been diagnosed with right-sided acoustic neuroma or vestibular schwannoma,[7] causing chronic

---

[7] "Neuroma" is a "[g]eneral term for any neoplasm derived from cells of the nervous system." Stedman's Medical Dictionary

dizziness and vertigo.  He has moderate to severe hearing loss in his left ear.  He was diagnosed with prostate cancer in 2015, and he declined an offer for a radical prostatectomy.  He has a history of stable angina,[8] coronary artery disease,[9] atrial fibrillation[10] with stable rate control, hypertension, dyslipidemia, gastroesophageal reflux disease, skin cancer, neurogenic bladder,[11] and epilepsy.  He suffers from essential tremors.  He is dependent on a wheelchair (and has been provided one since 2006), but he is able to transfer independently.  Straus and Kiely opined that the plaintiff has "multiple risk factors for mortality and morbidity" and has "debilitating conditions with high risk for permanent incapacitation."

---

1311 (28th ed. 2006).  "Schwannoma" is a "benign, encapsulated neoplasm in which the fundamental component is structurally identical to the syncytium of Schwann cells."  Stedman's Medical Dictionary 1730.

[8] "A severe, often constricting pain or sensation of pressure, usually referring to a. pectoris."  Stedman's Medical Dictionary 85.

[9] "[N]arrowing of the lumen of one or more of the coronary arteries, usually due to atherosclerosis."  Stedman's Medical Dictionary 554.

[10] Atrial fibrillation is a condition "in which the normal rhythmic contractions of the cardiac atria are replaced by rapid irregular twitchings of the muscular wall."  Stedman's Medical Dictionary 722-723.

[11] "Neurogenic" is defined as "[o]riginating in, starting from, or caused by, the nervous system or nerve impulses."  Stedman's Medical Dictionary 1310.

On January 25, 2021, Straus completed an updated medical parole assessment for the plaintiff, which provided additional information with respect to his medical conditions.  The plaintiff had an occipital craniotomy in November 2005 to address his vestibular schwannoma.  He suffers from tinnitus[12] and leg neuropathy and is incontinent for urine and stool.  He requires catheterization for his coronary artery disease.  He has experienced hypertension since he was the age of eight, and epilepsy since the age of sixteen.  He has had numerous surgeries, ranging from upper back surgery to surgery to address skin cancer.  He is overweight and experiences microcytic anemia.[13]  The plaintiff, at the time of the report, was being evaluated for congestive heart failure.  Straus opined that the plaintiff has "debilitating medical conditions with permanent mobility and other functional incapacitation."  He stated that the plaintiff was expected to survive the next eighteen months, "but at significant risk."

On July 29, 2021, Straus and Michelle Mulvey-Sylvia, a nurse practitioner, performed another medical parole assessment on the plaintiff.  This assessment conveyed much of the same

---

[12] "Perception of a sound in the absence of an environmental acoustic stimulus."  Stedman's Medical Dictionary 1992.

[13] "[I]n which the average size of circulating erythrocytes is smaller than normal."  Stedman's Medical Dictionary 79.

information as the first two assessments. It further indicated that he suffers from presbyopia[14] and seborrhea.[15] The assessment confirmed that the plaintiff must use a wheelchair "for movement" and that he has "multiple chronic medical condition[s]." Although the plaintiff has to use a wheelchair, he "is able to utilize the bathroom independently . . . , feed himself independently, shower independently, dress himself independently, and voice his needs without issue." Although Straus and Mulvey-Sylvia opined that his conditions "may contribute to a shortened lifespan," the plaintiff's chronic conditions were "stable" and he was expected to live for longer than eighteen months.

The July 2021 assessment specified various reasons that the plaintiff is provided his accommodations: he uses a wheelchair for "unsteady gait and tremors"; since 2013 he has been provided a bottom bunk for "seizures"; he is housed in a twenty-four hour health staff facility because it is "handicap accessible"; he is prescribed briefs and condom catheters for his "urinary incontinence"; and he is provided compression stockings for his "neuropathy." When he leaves the prison, he is transported by a

---

[14] "The physiologic loss of accommodation in the eyes in advancing age, said to begin when the near point has receded beyond 22 cm (9 inches)." Stedman's Medical Dictionary 1556.

[15] "Overactivity of the sebaceous glands, resulting in an excessive amount of sebum." Stedman's Medical Dictionary 1738.

wheelchair van, and he has a peer assistant who pushes his wheelchair. The plaintiff is able to stand only with support. He has been provided with extra pillows since 2006 and hearing aids since 2011. He is able to administer the catheter supplies himself. He is prescribed an extensive list of medications.

On at least one occasion in December 2020, the plaintiff was evaluated after he reported that he fell while transferring from his wheelchair to his bed, resulting in an injury to his ribs. Despite blood being found in the plaintiff's urine in January 2021, he refused to see a urologist. He stated to Kiely, who was performing his evaluation, that he would "not go no[] matter how hard [Kiely] tr[ied] to convince [him], [he felt] fine, [he had] no major issues, just the swelling." During that same evaluation, Kiely noted that, with his wheelchair, he was able to "self-propel[] up and down the ramp." The plaintiff reported that he felt "pretty good, no breathing issues, no heart issues," but he reported difficulty getting his medical supplies and swelling in his ankles and feet.

The plaintiff also has a documented mental health history, dating back to before he was incarcerated. Since his teenage years, the plaintiff has suffered from depression. In the 1980s, when he found out that he was being charged with the murders and arson, he attempted suicide, for which he was hospitalized for psychiatric treatment. At that same time, he

was diagnosed with major depressive disorder with melancholic symptoms. In 1989, he was sent to Bridgewater State Hospital (hospital) due to threats to "hang himself if he was convicted of the crimes [with which] he was charged."

He was diagnosed with adjustment disorder in 2020, and depressive disorder due to another medical condition, with depressive features. He has had several suicide attempts in the recent past. On May 20, 2020, the defendant was injured due to such an attempt and again was sent to the hospital. He had similar attempts in June and July 2020, when he attempted to use a bed sheet and a towel, respectively, for hanging. Also in 2020, the plaintiff experienced two hospitalizations for further psychiatric care due to "ongoing delusional thought patterns," as "[h]e believed that his family was in danger and he was being targeted by gang members because of the crimes [for which] he was convicted." The plaintiff believed that the only way to protect his family was to end his life, and he was "unable or unwilling to engage in reality testing." As of an evaluation completed on September 9, 2020, there are no further documented attempts to take his own life.

During an evaluation in January 2021, the plaintiff indicated that he was afraid to be admitted to a hospital, and that his primary methods of coping with his stressors were "becoming difficult due to lack of tablet and differing

recreation times."  Although he reported that he was feeling hopeless, he denied any intent to harm himself or others.

     4.  Plaintiff's disciplinary history.  The plaintiff has accumulated an extensive disciplinary record, but also has held jobs and completed programming.  While he was incarcerated at the Massachusetts Correctional Institution at Norfolk (MCI-Norfolk), during his early years of incarceration he received four disciplinary reports for fighting, threatening staff, not standing for a count, and lying.  During his ten years at MCI-Norfolk, he held several jobs as a janitor and attended stress management classes, health awareness, and church services.

     On June 25, 2001, the plaintiff was transferred to the Souza-Baranowski Correctional Center (SBCC) because he lied to staff about another inmate.  While he was there, he received three disciplinary reports for fighting with another inmate and possession of contraband (both in November 2006) and threatening another inmate (March 2007).  At SBCC, he worked as a "runner" and a property worker.

     On May 29, 2007, the plaintiff was transferred to MCI-Shirley, where he remained for thirteen years.  During his time there, he received three disciplinary reports for removing a blade from a razor (June 2007), missing a scheduled appointment (November 2011), and, most recently, being out of place and refusing a direct order (April 2019).  He completed a computer

skills program and intermittently worked as a housing unit runner.

In May 2020, he was transferred for psychiatric treatment to the hospital units at Old Colony Correctional Center following his suicide attempt at MCI-Shirley. On June 18, he returned to MCI-Shirley; after twelve days, he again was committed to the hospital due to "paranoid beliefs and suicidal ideation." He is not permitted to return to MCI-Shirley because of a "newly identified conflict" with another inmate.[16]

On the morning of June 21, 2020, during his brief return to MCI-Shirley, the plaintiff attempted "to use his bed sheet as a ligature," which led to a use of force by correction officers.[17] Several correction officers wrote reports regarding this incident. The lieutenant who used force against the plaintiff stated that he was taking property from the plaintiff's cell because of the plaintiff's being placed on a fifteen-minute mental health watch. According to the lieutenant, the plaintiff threw his watch toward the lieutenant, "narrowly missing," and "followed that with an awkward open hand punch to the chest." At that point, the lieutenant grabbed the plaintiff in his upper

---

[16] The plaintiff's classification report indicates that he has an "active" enemy due to false allegations made by the plaintiff.

[17] As part of our review, we watched the prison footage depicting this incident, which is discussed infra.

body area "to subdue him," during which the plaintiff wrapped his legs around a leg of the lieutenant and tried to twist the lieutenant's left wrist.  The lieutenant gave the plaintiff several orders to release the lieutenant's leg and hand; when the plaintiff did not respond, the lieutenant struck him with a closed fist in the back, causing him to release the lieutenant's hand.  The lieutenant twisted the plaintiff's arm behind his back to get him to release the lieutenant's leg, and he was put in restraints by two other correction officers.  The officers removed the plaintiff's boxer shorts, and a security smock was given to him.  When a sergeant attempted to remove the leg restraints from the plaintiff, the plaintiff tried to kick him. At that point, staff left the cell and returned approximately one minute later to move the plaintiff onto his back.

The accounts of the other officers present during the incident support the lieutenant's account.  Another lieutenant indicated that while holding the plaintiff on his side, he "continu[ed] his verbal beratement of staff and would not cease this behavior."  An officer stated that they were removing the plaintiff's belongings because he was on mental health watch for his safety.  As they were doing so, the plaintiff "refused [to surrender his clothing and belongings], became combative, and assaulted" the lieutenant.  Another officer indicated that she assisted the plaintiff onto his side to prevent positional

asphyxia while waiting for medical help to arrive, but the plaintiff refused medical assistance and became combative, so she was directed to leave the cell. A third officer reported that he saw the plaintiff assault the lieutenant and that, prior to the lieutenant's use of force, he noticed and reported to his supervisor that the plaintiff was fashioning a noose with his bed sheet by "tying the sheet into the vent on two separate occasions." A sergeant wrote that the plaintiff tried to kick him during the incident, which was supported by another officer. A responding nurse noted swelling to the plaintiff's left elbow. A captain, in a letter to the interim superintendent, stated that her review of this incident determined that it was in compliance with the use of force policies set out in 103 Code Mass. Regs. § 505. She wrote that the plaintiff became noncompliant by refusing to have property removed from his cell, and that he escalated the situation by becoming aggressive and assaultive toward security staff.

Discussion. 1. Standard of review. As discussed in McCauley, 491 Mass. at    , where the decision of the commissioner to grant or deny medical parole is one of administrative discretion, we apply "the 'arbitrary or capricious' standard." Mederi, Inc. v. Salem, 488 Mass. 60, 67 (2021), quoting Revere v. Massachusetts Gaming Comm'n, 476 Mass. 591, 605 (2017). "A decision is not arbitrary and capricious

unless there is no ground which 'reasonable [persons] might deem proper' to support it." Garrity v. Conservation Comm'n of Hingham, 462 Mass. 779, 792 (2012), quoting T.D.J. Dev. Corp. v. Conservation Comm'n of N. Andover, 36 Mass. App. Ct. 124, 128 (1994). Keeping in mind our determination in McCauley that 501 Code Mass. Regs. § 17.02 does not impermissibly narrow the statute, we analyze the commissioner's decision in the present case.

2. Medical parole plan. The plaintiff argues that the statute places a burden on the superintendent to prepare a comprehensive medical parole plan for the prisoner. He asserts that the medical parole plan is a factor for the commissioner to consider in making the determination whether a prisoner qualifies for medical parole, and the fact that the superintendent failed to propose a plan in his case, along with the absence of an application for interstate transfer of parole, created a substantial error of law affecting his rights. The defendants argue that, because the plaintiff proposed a detailed medical plan, there was no need for the superintendent to develop one and that, even assuming there was such a requirement, the provision of a department-authored medical parole plan would not have influenced the commissioner's decision here where she determined that he was not permanently incapacitated.

General Laws c. 127, § 119A (a), defines "[m]edical parole plan" as

> "a comprehensive written medical and psychosocial care plan specific to a prisoner and including, but not limited to: (i) the proposed course of treatment; (ii) the proposed site for treatment and post-treatment care; (iii) documentation that medical providers qualified to provide the medical services identified in the medical parole plan are prepared to provide such services; and (iv) the financial program in place to cover the cost of the plan for the duration of the medical parole, which shall include eligibility for enrollment in commercial insurance, Medicare or Medicaid or access to other adequate financial resources for the duration of the medical parole."

The statute indicates that "[t]he superintendent shall transmit with the recommendation: . . . a medical parole plan," in addition to a written diagnosis by a physician and the risk for violence assessment. G. L. c. 127, § 119A (c) (1).[18]

Originally, before the regulations were amended, 501 Code Mass. Regs. § 17.03(3)-(4) (2019) required a petitioner to develop a medical parole plan that detailed the information mentioned in the statute.[19] In Buckman v. Commissioner of

---

[18] The statute has equivalent requirements for a sheriff. G. L. c. 127, § 119A (d) (1). Throughout this opinion, we discuss the statute and the regulations as applied to a superintendent, but our discussion is applicable equally to a sheriff.

[19] The medical parole plan was required to discuss the proposed course of treatment; level of care required and the site for treatment; availability of medical care and documentation indicating that qualified medical providers were prepared to provide treatment; and the financial program in place to cover the cost of the plan. 501 Code Mass. Regs. § 17.03(4) (2019).

Correction, 484 Mass. 14, 29-30 (2020), we voided the above regulations in addition to several other regulations "to the extent that they declare[d] that the medical parole plan or written diagnosis by a licensed physician must be provided by the petitioner." The court reasoned that "the Legislature did not intend to place this burden on those so poorly able to bear it" and held that "the superintendent bears the burden" of preparing a medical parole plan and a written diagnosis. Id. at 29. This determination was made based on the Legislature's intent "to trigger a collaborative process whereby the health care provider for the institution, reentry staff, and the prisoner . . . work together" to prepare the required documents. Id.

The current version of 501 Code Mass. Regs. § 17.03(4), as amended in 2022, indicates that "[a] proposed medical parole plan may be submitted along with the petition, but, where not submitted by the petitioner, said proposed plan shall be developed by the superintendent prior to transmitting the petition to the [c]ommissioner." Similarly, the current version of 501 Code Mass. Regs. § 17.04(4) states that the superintendent shall transmit a recommendation to the commissioner, along with several other documents, including "a proposed medical parole plan" and "an updated clinical review of the prisoner by a licensed physician."

In Malloy v. Department of Correction, 487 Mass. 482, 494 (2021), this court discussed the obligation of the department in identifying appropriate placements in a medical parole plan "[a]t least for inmates without family home-care options." "[W]ithin twenty-one days of a petition for medical parole, a prison superintendent must submit a recommendation to the commissioner accompanied by a medical parole plan." Id. at 493. Recognizing the "contingencies at the conclusion of this process when medical parole is granted," the court stated that the department's proposed medical parole plan must be comprehensive. Id. at 495.

Neither Buckman nor Malloy discussed whether a superintendent must submit an additional medical parole plan where a prisoner has drafted his or her own. Here, the plaintiff included a medical parole plan in his petition, which indicated that he would live with his daughter, her husband, their children, and the plaintiff's father if he were to be released. The plan described the floor plan of the home, which is wheelchair accessible and has a chair lift; indicated where the plaintiff would receive medical care and who his primary care doctor would be; and specified that his care would be funded by public health insurance. The superintendent's recommendation incorporated and detailed the medical parole plan submitted by the petitioner.

The inclusion of the plaintiff's medical parole plan, where the superintendent did not indicate that he found the plan inadequate, was sufficient to satisfy the requirement that "[t]he superintendent shall transmit with the recommendation: . . . a medical parole plan."  G. L. c. 127, § 119A (c) (1). The plaintiff's medical parole plan satisfied most of the statutory requirements.  Although it did not detail explicitly the proposed course of treatment or provide documentation regarding his proposed physician, it specified the location of the medical facility where he would receive "medical care services," including for "emergencies," and identified his expected primary care doctor.  See G. L. c. 127, § 119A (a) (i)-(iii).  It further indicated where and with whom he would live, stated that his family would help him to ensure his services were obtained, and described the home he would live in, indicating that it is wheelchair accessible.  Taking into consideration the many "contingencies" in the medical parole process, "including changes in the medical condition of the prisoners, availability of beds in care facilities, and conditions imposed by the parole board," along with COVID-19, it would be difficult, if not impossible, for a proposed medical parole plan to be precise regarding the particular course of treatment that the petitioner will undergo on release from prison, especially where many prisoners, including the

plaintiff, suffer from numerous ailments requiring various forms of treatment. Malloy, 487 Mass. at 495. Additionally, the plaintiff's medical parole plan, referred to by the superintendent, provided that his treatment would be funded by public health insurance. See G. L. c. 127, § 119A (a) (iv). It would make little sense to require the superintendent to create an additional medical parole plan where the plaintiff has provided a comprehensive plan, and where the superintendent does not voice his or her disagreement with the plan. Because the superintendent included this plan in his recommendation, he fulfilled his requirement to submit a medical parole plan to the commissioner.

The Superior Court judge found that this reference did not fulfill the superintendent's obligation because the information in the petition failed to satisfy fully the statutory requirements. The judge cited Malloy in support, where this court referenced a superintendent's medical parole plan that only included information provided by the petitioner, and stated "this paragraph appears to be the entirety of the medical parole plan submitted to the commissioner." Malloy, 487 Mass. at 488. Malloy is not determinative in this case. First, the plan in Malloy was significantly less detailed than the plaintiff's

medical parole plan.[20]  It failed to mention the proposed course of treatment, the proposed site for treatment and posttreatment care, and documentation that medical providers were willing to provide him medical services.  Indeed, his plan only satisfied the statute in that it indicated the financial program in place to cover the costs of his health care.  G. L. c. 127, § 119A (a) (iv).  Second, Malloy did not discuss whether the superintendent's submission describing the petitioner's plan was inadequate, as the petitioner already had been released on medical parole, so his appeal was moot.  Malloy, supra at 500.

We do not condone the statutory insufficiency of the medical parole plan submitted to the commissioner by the superintendent here, and of course, we do not fault the plaintiff for that insufficiency.  Where a petitioner submits his or her own medical parole plan, and there are gaps in the information required by the statute, the superintendent should work with the petitioner in a "highly collaborative process" to

---

[20] The medical parole plan in Malloy stated in its entirety:

"[The petitioner's attorney] states that if released on medical parole, [Malloy] would be willing to live any place that is agreeable to the Department of Correction[]. [Malloy] has been accepted to handicapped accessible section 8 housing in Worcester and has documentation for it.  His financial source of payment would be through Mass[H]ealth Medicare."

Malloy, 487 Mass. at 488.

ensure it is complete. Malloy, 487 Mass. at 500. But where, as here, the petitioner submits a comprehensive, yet statutorily insufficient plan, detailing where and with whom he will live, describes the home and its accessibility for his wheelchair, indicates who his caregivers will be, who will "work to ensure all medical and mental health services are obtained," discusses the insurance that would fund his medical care, indicates where he will receive medical services, for both everyday care and emergencies, and indicates who his primary care doctor will be, it would be senseless for a superintendent to start from scratch to create an alternative medical parole plan. Because the superintendent fully detailed this thorough plan in his submission to the commissioner, he complied with the statute with the exception of the provision of documentation regarding the proposed physician and a description of the proposed course of treatment. As discussed infra, we do not think these minute deficiencies had an impact on the commissioner's decision.

Our decision in McCauley, 491 Mass. at    , remanding the petition to the commissioner for the completion and consideration of a standardized risk assessment, does not compel a different result. First, in McCauley, there was no attempt to provide a standardized risk assessment required by the regulation. Id. at    . Here, the plaintiff submitted a comprehensive medical parole plan largely complying with

statutory requirements, which the superintendent then forwarded to the commissioner.  Second, in McCauley, the standardized risk for violence assessment would have been important for the commissioner to consider in the first instance with respect to whether the prisoner would pose a risk to the safety of the public on release; it could not have been changed or supplemented were the commissioner to determine that the prisoner should be released.  In contrast, the medical parole plan here, as the plaintiff admits, "accounted for his medical and mental health needs and supervision."  The plan addressed where he would stay, who would supervise him, and who would ensure that his medical needs were addressed.  Indeed, the commissioner described the medical parole plan in her decision without indicating that she considered it to be inadequate.  Any of its inadequacies could have been accounted for through the imposition of conditions by the parole board were the commissioner to decide that the plaintiff was permanently incapacitated or terminally ill as defined by the statute.  See G. L. c. 127, § 119A (e) ("parole board shall impose terms and conditions for medical parole that shall apply through the date upon which the prisoner's sentence would have expired"); Malloy, 487 Mass. at 494-495 (stressing importance of plan setting out proposed site for placement, but acknowledging parole board may change proposed plan, including potential addition of

"electronic monitoring, supervision for drugs and alcohol, visitation by parole officers, and no-contact orders" among other conditions to protect public safety).

3. Denial of petition for medical parole. The plaintiff argues that his medical conditions are so debilitating that he does not pose a public safety risk, as his current medical conditions demonstrate irreversible permanent incapacitation. He asserts that the medical assessment from January 2021 opined that he was permanently incapacitated, and that the statute does not require complete absence of independent functioning. He points to the 2009 risk assessment, which he asserts demonstrated that he is of low risk for violence and substance use disorder, and argues that the majority of his disciplinary reports are dated and precede his incapacity, highlighting that he has participated in programs. He also argues that the commissioner's review of the video of the use of force incident is inaccurate. Finally, he argues that maintaining his innocence should not be considered as a factor in denying him medical parole.[21]

The defendants argue that the commissioner's decision was supported properly by the plaintiff's ability to perform

---

[21] In his reply brief only, the plaintiff "joins [Martin McCauley's] argument that the regulation is void." As discussed in McCauley, 491 Mass. at    , we have concluded that it is not.

activities of daily living independently, as discussed by 501 Code Mass. Regs. § 17.02, the seriousness of the crimes that resulted in his incarceration and his ability to carry out a similar act, and his involvement in the recent use of force incident, as both depicted in the video and discussed in the reports.

We cannot say that the commissioner's decisions denying the plaintiff medical parole are arbitrary and capricious such that there is "no ground which 'reasonable [persons] might deem proper' to support [them]." Garrity, 462 Mass. at 792, quoting T.D.J. Dev. Corp., 36 Mass. App. Ct. at 128. The commissioner relied on appropriate factors in making her determination that the plaintiff does not qualify for medical parole.

"Permanent incapacitation" is defined as "a physical or cognitive incapacitation that appears irreversible, as determined by a licensed physician, and that is so debilitating that the prisoner does not pose a public safety risk." G. L. c. 127, § 119A (a).[22] The commissioner shall order release on medical parole where she determines that a prisoner is "permanently incapacitated such that if the prisoner is released the prisoner will live and remain at liberty without violating

_____

[22] We discuss permanent incapacitation, as the plaintiff does not allege that he is terminally ill within the meaning of the statute.

the law and that the release will not be incompatible with the welfare of society." G. L. c. 127, § 119A (e). As discussed in McCauley, 491 Mass. at    , the definition of "debilitating condition" in the regulation does not impermissibly narrow the class of persons who qualify for medical parole. Title 501 Code Mass. Regs. § 17.02, as in effect at the time of the plaintiff's petition, stated:

> "A physical or cognitive condition that appears irreversible, resulting from illness, trauma, and/or age, which causes a prisoner significant and serious impairment of strength or ability to perform daily life functions such as eating, breathing, toileting, walking or bathing so as to minimize the prisoner's ability to commit a crime if released on medical parole, and requires the prisoner's placement in a facility or a home with access to specialized medical care."

In the initial medical parole assessment submitted to the commissioner, Straus and Kiely opined that the plaintiff had debilitating conditions and was at "high risk for permanent incapacitation," but currently was not physically incapacitated. In the January 2021 updated assessment by Straus, he opined that the plaintiff had "debilitating medical conditions with permanent mobility and other functional incapacitation." Therefore, at that point, Straus had determined that the plaintiff suffered from "a physical . . . incapacitation that appears irreversible." G. L. c. 127, § 119A (a). The commissioner appeared to conflate the two prongs of § 119A (a): (1) a finding by the physician indicating "irreversible"

incapacitation and (2) evidence that the condition is so debilitating that the prisoner does not pose a public safety risk.[23]  Nonetheless, it is clear, in light of the factors that she considered, that the commissioner ultimately determined that his medical conditions did not so debilitate him such that he no longer posed a public safety risk.  The commissioner's determination that the plaintiff's release would pose a public safety risk was within her discretion based on the factors that she properly considered.

The commissioner properly considered the plaintiff's ability to perform independently a significant number of activities of daily living as a factor in her determination that he does not qualify for medical parole in each of her decisions.  As Straus opined, and as indicated supra, the plaintiff has numerous debilitating conditions that cause permanent mobility concerns and result in other forms of functional incapacitation. The plaintiff is dependent on a wheelchair.[24]  Despite his

---

[23] For example, in the March 2021 decision, the commissioner wrote:  "Dr. Straus does not opine that [the plaintiff] is currently 'terminally ill' or 'permanently incapacitated' within the meaning of the medical parole statute . . . .  Accordingly, I do not find that [the plaintiff's] current medical condition is 'so debilitating that [he does] not pose a public safety risk.'"

[24] The plaintiff takes issue with the commissioner's finding that his requirement for a wheelchair was only due to "unsteady gait and tremors" as opposed to "physical weakness."  The July 2021 medical parole assessment opined that the plaintiff uses a

dependence, however, he is able to transfer independently. He requires catheterization, but he is able catheterize himself. He is able to "utilize the bathroom independently . . . , feed himself independently, shower independently, dress himself independently, and voice his needs without issue." The superintendent's recommendation indicated that the plaintiff has a peer assistant to push his wheelchair, but his medical records indicate that in January 2021 during an evaluation he was able to "self-propel[] up and down the ramp." The plaintiff is correct that complete absence of independent functioning is not required by either the statute or the regulation. As discussed in McCauley, 491 Mass. at    , although it is just one factor to be considered in the comprehensive evaluation of a petitioner, consideration of ability to perform independently the vast majority of activities of daily living is a relevant factor, as set out by 501 Code Mass. Regs. § 17.02, that is pertinent to the definition of permanent incapacitation in the statute.

The commissioner's decision properly discussed additional factors in determining that the plaintiff, if released, would

_____

wheelchair for "unsteady gait and tremors"; thus, the commissioner's finding that the plaintiff's gait and tremors require him to use a wheelchair is grounded in the record. It is difficult to understand how that in itself does not constitute "physical weakness." Nonetheless, this distinction did not have an impact on the commissioner's decision where she recognized that "[h]e requires a wheelchair."

not "live and remain at liberty without violating the law" and that his release "would be incompatible with public safety and the welfare of society." Another factor that she considered was the plaintiff's 2009 risk assessment.[25] See 501 Code Mass. Regs. § 17.04 (2022). The risk assessment noted that the plaintiff had been arrested or charged three or more times with a new crime while on pretrial release. It noted that the plaintiff has received serious or administrative disciplinary infractions for fighting or threatening other inmates or staff. In the section entitled "Criminogenic Need Scales," the assessment indicated that both his violence history and current violence were "high." Despite this indication, the assessment concluded, without explanation, that his violence and recidivism risk were "low."

Further, the plaintiff's crimes for which he was incarcerated were a proper factor to consider, and the commissioner did not give them undue weight. The facts of the plaintiff's crimes were highly violent and resulted in fifteen convictions of murder in the second degree for his setting fire to a rooming house in the early hours of the morning and killing

---

[25] The plaintiff protests that the commissioner "states nothing" about the risk assessment in her latest decision. Nonetheless, her first decision mentions the assessment, including its conclusion that he is a "low risk for violence and recidivism." Thus, the commissioner was aware of its contents and considered it in making a decision.

fifteen people.  Carver, 33 Mass. App. Ct. at 379-380.  The facts of the plaintiff's convictions were indicated in the superintendent's recommendation to the commissioner, which is contemplated by both the statute and the regulation.  See G. L. c. 127, § 119A (c) (1); 501 Code Mass. Regs. § 17.04 (2022).  As discussed in McCauley, 491 Mass. at   , the statute does not require that the commissioner limit consideration to whether a petitioner is capable of committing the same or a similar offense to that resulting in his or her incarceration; the inquiry is more general and centers around concern for public safety as set out in the statute.  Nonetheless, that the plaintiff physically is capable of setting fire to a building is relevant to the danger he may pose to the public on release.[26]

The plaintiff's disciplinary reports also were an appropriate factor to consider in determining whether he qualified for medical parole, as mentioned in his classification report and the superintendent's recommendation.[27]  See G. L. c. 127, § 119A (c) (1); 501 Code Mass. Regs. § 17.04 (2022).

---

[26] As discussed in McCauley, 491 Mass. at   , the plaintiff's refusal to admit guilt should not have been counted against him.  In the context of all the other factors the commissioner considered in making a determination here, her reference to his assertion of innocence does not invalidate the commissioner's decision.

[27] The commissioner also recognized the plaintiff's "moderate programming history," noting that most of it "occurred two decades ago."

The commissioner recognized that "most of [the plaintiff's] disciplinary reports of a serious nature are remote in time," but their age does not render them wholly irrelevant to the safety of the public on his release where he has a history of fighting, threatening staff and other inmates, lying, possessing contraband, and removing a blade from a razor. The plaintiff is not permitted to return to MCI-Shirley because of a "newly identified conflict" with another inmate.

The commissioner most heavily relied on the use of force incident in her discussion of the plaintiff's disciplinary history. The plaintiff disputes the commissioner's characterization of the incident. The reports and the video were appropriate for the commissioner to consider in determining whether the plaintiff qualified for medical parole as they bear on the plaintiff's physical ability to engage in a struggle. See G. L. c. 127, § 119A (a) (defining permanent incapacitation as physical or cognitive condition that is "so debilitating that the prisoner does not pose a public safety risk" [emphasis added]). Further, in the plaintiff's counsel's affidavit to the Superior Court judge, she indicated that the incident was referenced by the superintendent in his materials sent to the commissioner as a part of his recommendation.

At the outset, given that the commissioner deemed the reports surrounding the use of force incident relevant, review

of the video, which readily was available, was appropriate.  We agree with the Superior Court judge who heard the plaintiff's motion to strike the administrative record that "where the [c]ommissioner has . . . deemed reports describing the . . . incident relevant, it is difficult to understand how video evidence of the incident would not also be relevant."  The video was within the control of the department, as it was sent to the plaintiff's counsel and received in January 2021.  It should not have taken an order from a judge for the commissioner to review video of an incident that was accessible and heavily relied on in the decision to deny the plaintiff medical parole.

Our review of the video reveals that it corroborates, or at the very least, does not refute, the statements in the reports. The video of this incident depicted the plaintiff's attempt to hang a sheet on the wall of his cell, until he was interrupted by correction officers.  The officers began to remove everything from the plaintiff's cell, and the plaintiff lunged on his bed to try to grab his wheelchair before they removed it.  There is no audio to the video, but it appears that the plaintiff argued with the officers as they removed things from his cell.  As officers attempted to pull the sheets off the bed, the plaintiff pulled them back in a struggle with the officers.  He took off his watch and threw it; the watch landed on the ground beside

one of the officers, and another officer picked it up.[28]  Next, the plaintiff made a motion toward an officer, and the officers pinned him to the bed.[29]  As the lieutenant held down the plaintiff on the bed, the plaintiff wrapped his legs around the lieutenant's leg.  The lieutenant punched the plaintiff during the struggle.  Eventually, six officers responded to this incident, and four tried to secure the plaintiff's hands and feet.  The officers removed the plaintiff's clothes and held him down on his side.  After a few minutes, it appeared that an officer tried to take off the plaintiff's foot restraints.  In response, the plaintiff kicked his feet and struggled with the officers again.  The officers then left the plaintiff restrained, placed him flat on his stomach, and closed the door to his cell.  A little over a minute later, officers went back into the plaintiff's cell, turned him over, and put over him what appeared to be a blanket.  The plaintiff's face suggested that he was in pain.  Throughout this video, the plaintiff did not rise from his bed, and continued to speak with officers.[30]

---

[28] The report states that the plaintiff threw his watch toward the officers and missed.

[29] Because of the angle of the video and where the officers were standing, it is not possible to see what the plaintiff did to the officer.  The report claims that the plaintiff threw "an awkward open hand punch to the [lieutenant's] chest."

[30] The reports indicate that the plaintiff berated staff and was aggressive throughout the incident.

The commissioner's discussion of the use of force incident is not contradicted by anything that appeared in the video. The commissioner failed to note that the plaintiff never stood up throughout the incident. Nonetheless, the plaintiff's legs were seen wrapping around the lieutenant's leg, and it took four officers to secure the plaintiff. When an officer attempted to remove his foot restraints, the plaintiff kicked at the officer. This incident was recent, as it happened in June 2020. This lends support to the commissioner's determination that the plaintiff is not so debilitated that he does not pose a risk to public safety.

This incident happened as a result of the plaintiff's attempts to harm himself during a mental health crisis. This was not the first time that the plaintiff tried to take his own life. Leading up to this incident, in May, the plaintiff attempted suicide and was sent to the hospital, and soon after, in July, he made a similar attempt. The plaintiff argues, in one paragraph and without citing case law for support, that "the [c]ommissioner could not have discriminated based on [his] mental state in denying medical parole without violating the Americans with Disabilities Act." The plaintiff does not explain how the commissioner discriminated against him based on his mental state, nor does he assert conclusively that she did. As a result, his briefing on this issue does not rise to the

level of appellate argument. See Commonwealth v. Beverly, 485 Mass. 1, 16 (2020); Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass. 1628 (2019).

Nonetheless, the commissioner referenced the plaintiff's mental health history in her original decision without indicating that it had an impact on her determination, and in her March 2021 decision, she stated that the plaintiff's attorney "indicate[d] that [the plaintiff's] mental health is stable, and I have not received any information to the contrary." Therefore, it does not appear that she treated his mental health history as a factor suggesting that he would pose a danger on release. Contrast Crowell v. Massachusetts Parole Bd., 477 Mass. 106, 112-113 (2017) (where board "indicated its awareness both of the plaintiff's disability and of how symptoms stemming from that disability could affect his behavior . . . on parole," board should have considered risk reduction programs). Although the commissioner did not reference that the use of force incident was in response to a mental health crisis, she considered the incident for its depiction of the plaintiff's physical ability to be combative and violent, not for the motivations behind the plaintiff's physical actions. This was not discriminatory.

We do not think that the absence of two statutory requirements in an otherwise comprehensive medical parole plan

influenced the commissioner's decision, given her extensive discussion of other factors and her brief reference, only in the first decision, to the plaintiff's medical parole plan, in addition to the reasons discussed supra.[31]  This further is evidenced by the commissioner's decision in Malloy, 487 Mass. at 489, where she granted the appellant's petition and allowed release "conditional on a suitable home care plan."  This suggests that the commissioner is willing to grant release, even where she believes that the initial home care plan is inadequate, and that the department will work with a prisoner to ensure an appropriate plan is established prior to release.[32]

The plaintiff set fire to a building and killed fifteen people.  Carver, 33 Mass. App. Ct. at 379.  Although he suffers from numerous serious medical conditions, and Straus's second medical evaluation opined that he has "permanent mobility and other functional incapacitation," he is able to perform activities of daily living including feeding, showering, dressing, and voicing his needs independently, and he is able to

---

[31] For the same reason, we do not think that the failure of the department to prepare an Interstate Compact for Adult Offender Supervision application was fatal in this case.

[32] In addition, in response to questioning at oral argument in McCauley, 491 Mass. at    , counsel for the commissioner provided several decisions where the commissioner determined that a petitioner was permanently incapacitated, despite an inadequate proposed plan.

administer his catheter supplies himself.  He is able to maneuver his wheelchair on his own, as indicated in a medical evaluation.  See McCauley, 491 Mass. at    (consideration of ability to perform majority of activities of daily living appropriate).  His chronic medical conditions are "stable."  He has received disciplinary reports for fighting, threatening people, lying, removing a razor from a blade, and possession of contraband.  During a mental health crisis, as correction officers tried to remove items from his cell to protect him, he struggled with the officers, wrapping his legs around a lieutenant's leg, requiring four officers to secure him.  Considering the above factors, and additional factors discussed supra, the commissioner's determination that the plaintiff is not so debilitated that he does not pose a public safety risk was not arbitrary or capricious.

Conclusion.  Because we see no reason to disturb the decisions of the commissioner, we affirm the judgment of the Superior Court denying the plaintiff's request for relief.

So ordered.